**BURSOR & FISHER, P.A.**
Philip L. Fraietta (State Bar No. 354768)
50 Main Street, Suite 475
White Plains, NY 10606
Tel: (914) 874-0710
Fax: (914) 206-3656
E-Mail: pfraietta@bursor.com

*Counsel for Plaintiff*

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| TREVOR LUTGE, individually and on behalf of all others similarly situated,<br><br>                Plaintiff,<br><br>    v.<br><br>TIMEX.COM, INC.,<br><br>                Defendant. | Case No.  3:26-cv-00960<br><br>**CLASS ACTION COMPLAINT**<br><br>**<u>DEMAND FOR JURY TRIAL</u>** |

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

Plaintiff Trevor Lutge brings this action on behalf of himself, and all others similarly situated (the "Class Members"), against Defendant Timex.com, Inc. ("Defendant" or "Timex"). Plaintiff makes the following allegations pursuant to the investigation of his counsel based upon information and belief, except as to allegations specifically pertaining to himself, which are based on personal knowledge.

## NATURE OF THE ACTION

1.      This is a class action lawsuit brought on behalf of all U.S. residents who accessed and navigated www.timex.com (the "Website") and whose electronic communications were intercepted or recorded by advertising technology provided by third parties, including Klaviyo, Inc. ("Klaviyo" or the "Third Party").

2.      Timex  "designs, manufactures and markets innovative timepieces around the world."[1]  Timex uses its Website as an online marketplace, where consumers can browse, and purchase various timepieces.

3.      When consumers visit the Website, they are presented with the opportunity to opt out of third-party tracking technologies including those which Defendant uses for targeted advertising and website performance.

4.      Unbeknownst to its customers, and contrary to its express assurance that customers have control over the sale and sharing of their personal information, Defendant intercepts and discloses its customers personally identifiable information ("PII"), and product purchase information to unknown third parties—including, but not limited to, Klaviyo—even when customers affirmatively disable the tracking technologies

5.      Defendant aids, agrees with, employs, or otherwise enables third parties, including Klaviyo, to eavesdrop on communications sent and received by Plaintiff and Class Members on the Website that Defendant owns and operates, including communications that contain PII.  By failing to procure consent—and continuing to allow the third parties tracking even after consumers reject the tracking technologies—Defendant violated the Electronic Communications Privacy Act

---

[1] LINKEDIN, *About Us*, https://www.linkedin.com/company/timex-group.

("ECPA") (18 U.S.C. §2511, *et seq.*); the California Invasion of Privacy Act ("CIPA") § 631–32, 638.51; and the California Constitution.

## PARTIES

### *Plaintiff*

6.      Plaintiff Trevor Lutge is a resident and citizen of San Francisco, California. Plaintiff was in California when he visited the Website.

7.      Plaintiff has visited Defendant's Website multiple times to purchase various timepieces.  For example, on or around February 13, 2025, Plaintiff accessed Defendant's Website—while in California—and purchased a Men's Timex Waterbury Traditional G.M.T. 39mm Tan Leather Strap Watch on Defendant's Website.  Despite Defendant's representations of confidentiality, Plaintiff's communications during this visit were intercepted and disclosed to third parties, including Klaviyo, through the tracking technologies, including communications that contained Plaintiff's identity and information about his purchases.  Neither Defendant nor Klaviyo procured Plaintiff's consent prior to these interceptions, nor was Plaintiff on notice of the fact that such interceptions were occurring—in fact, Plaintiff expressly rejected such tracking.  Such disclosures are a violation of Plaintiff's privacy and were done intentionally for targeted advertising purposes.  Plaintiff was unaware that Defendant intercepted and disclosed his communications until just prior to filing this lawsuit.

### *Defendant*

8.      Defendant Timex, Inc. is a Delaware corporation, headquartered in Shelton, Connecticut.  Defendant owns and operates the Website.

9.      Defendant knowingly and intentionally incorporated a host of tracking technologies for marketing, advertising, and analytics purposes on the Website without disclosure to its users, including the tracking technologies provided by Klaviyo.

10.      Defendant configured the Tracking Technologies such that even if a customer rejected their use, several tracking technologies continued to intercept their identity and purchase information. Defendant chose to do so despite the privacy representations it made to consumers.

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED                    2

## JURISDICTION AND VENUE

11.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because it arises under a law of the United States (the Electronic Communications Privacy Act, 18 U.S.C. § 2511).  This Court also has supplemental jurisdiction over Plaintiff's state law claims under 28 U.S.C. § 1367.  Further, this action is a putative class action, and Plaintiff alleges that at least 100 people comprise the proposed class, that the combined claims of the proposed class members exceed $5,000,000 exclusive of interest and costs, and that at least one member of the proposed class is a citizen of a state different from Defendant.

12.     This Court has personal jurisdiction over Defendant because Defendant purposefully directs its business activities in this District by offering its products to residents of this District and conducting a substantial amount of business in this District. Further, Plaintiff was residing in this District when he accessed the Website and had the Tracking Technologies installed on his device, which Defendant knew would cause harm throughout California, including within this District.

13.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) because Defendant does substantial business in this District, a substantial part of the events giving rise to the claim occurred in this District, and Plaintiff resides in this District.

## FACTUAL ALLEGATIONS

A.     **Defendant's Website and Privacy Representations**

14.     "[W]ebsite owners often manipulate their privacy settings to make it harder for consumers to protect their privacy."[2]

15.     "Cookies allow the websites to track user information for profiling and targeted advertising.  The cookie consent notices will typically ask for consent to data collection and state how the data will be used.  In this decision-making setting, users often have incomplete

---

[2] Danyang Li, *The FTC and the CPRA's Regulation of Dark Patterns in Cookie Consent Notices*, 1 U. CHI. BUS. L. REV. 561 (2022) https://businesslawreview.uchicago.edu/print-archive/ftc-and-cpras-regulation-dark-patterns-cookie-consent-notices; Midas Nouwens et al., Dark Patterns After the GDPR: Scraping Consent Pop-Ups and Demonstrating Their Influence, PROC. 2020 CHI CONF. ON HUM. FACTORS COMPUTING SYS. 1–13 (2020).

information regarding the cookie settings, which puts them at a disadvantage when compared with web designers."[3]

16.    Through its Website, Defendant promises customers that it will keep their personally identifiable electronic communications confidential.  Defendant also purports to offer consumers an opportunity to reject tracking by allowing its customers to select the "Do Not Sell My Personal Information" button.  *See* Fig. 1–2.  Unbeknownst to consumers, this choice is illusory; Defendant shares sensitive details about its customers' identities and purchases even if the consumer rejects Defendant's cookie banner.



**Figure 1**



**Figure 2**

---

[3] *Id.*

17.     When a consumer interacts with this cookie banner and clicks "Do Not Sell My Personal Information" Defendant offers them the choice to disable non-required cookies (i.e., performance cookie and targeting cookies).  *See supra* Figs. 2–3.

**Figure 3**

18. Further, Defendant explicitly warrants the tracking technologies it installed on the Website do not store its customers' personal information.  For example, Defendant warrants (1) Strictly Necessary Cookies "do not store any personally identifiable information", (2) the information collected by Performance Cookies "is aggregated and therefore anonymous" and (3) that Targeting Cookies "do not store directly personal information."  Fig.

19. The Tracking Technologies discussed herein, commonly fall under the category of Targeting/Targeted Advertising Cookies.

20. Despite Defendant's claims it does not share directly personal information, (***Defendant makes this representation irrespective of whether a consumer accepts or rejects cookies***), Defendant enables third parties—including Klaviyo—to that track consumers'—including Plaintiff's—Website browsing activities and eavesdrop on users' private communications on the Website.

21. As courts across the country have recognized, the identifiers that the Tracking Technologies capture—names, email address, phone number, and social media IDs—constitute "directly personal information."  *See supra* Fig. 2.  By capturing this information, contrary to its explicit representation not to, Defendant fails to receive consent from customers to intercept their communications.

22. Further, Defendant continues to track consumers even after they ***reject*** these tracking technologies.

23. Though the advertising technology provided by Klaviyo (the "Tracking Technologies"), Defendant intercepts and discloses information about Plaintiff's and Class Members' identity and purchases.  Defendant engages in this conduct despite clear promises not to do so.

//

//

//

//

//

**B.    Consumers Have A Financial Stake In Companies' Promises Relating To Their Data Privacy**

24.    "In an era where every click, tap or keystroke leaves a digital trail, Americans remain uneasy and uncertain about their personal data and feel they have little control over how it's used."[4]

25.    "The value of consumer data often comes from identifying users and combining their data from various sources.  This is possible, in part, through the ubiquity of personally identifiable information (PII) and unique identifiers, as well as identifying individuals from non-PII, such as aggregated or anonymized data.  The ability to identify users enables website and app operators to combine data and track user activity across devices."[5]

26.    "Advertisers, as well as website and app operators, have incentives to improve their ad targeting by collecting detailed information about each user.  Advertisers might expect more precise targeting to increase sales.  Websites' revenue may depend on how frequently users click on the ad or how much time users spend viewing the ad."[6]

27.    For retailers—like Defendant—the ability to compile consumer patterns into algorithms improves how precisely they can sell to those same consumers.[7]

28.    With increased surveillance of consumers' purchase patterns, consumer concern over the control of their data privacy has continued to grow:

- "86% of Americans are more concerned about their privacy and data security than the state of the U.S. economy – but two-thirds either don't know or are misinformed about how their data is being used and who has access to their

---

[4] Colleen McClain, Michelle Faverio, Monica Anderson, & Eugenie Park, *How Americans View Data Privacy*, PEW RESEARCH CENTER (October 18, 2023), https://www.pewresearch.org/internet/2023/10/18/how-americans-view-data-privacy/

[5] CLARE Y. CHO & LING ZHU, CONG. RSCH. SERV., R47298, *Online Consumer Data Collection and Data Privacy*, (October 31, 2022), https://www.congress.gov/crs-product/R47298.

[6] Clare Y. Cho, CONG. RSCH. SERV., IF11448, *How Consumer Data Affects Competition Through Digital Advertising*, (January 26, 2023), https://www.congress.gov/crs-product/IF11448.

[7] Charles Duhigg, *How Companies Learn Your Secrets*, N.Y. TIMES, Feb. 16, 2012, https://www.nytimes.com/2012/02/19/magazine/shopping-habits.html (example of how Target used consumer characteristics to identify and market to pregnant women).

---

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED                    7

privacy"[8]

- "67% of respondents don't understand what data privacy means or how their data is being used"[9]
- The public increasingly says they don't understand what companies are doing with their data. Some 67% say they understand little to nothing about what companies are doing with their personal data, up from 59%[10]
- 72% of Americans say there should be more [government] regulation than there is now; just 7% say there should be less. [11]
- Roughly four-in-ten Americans say they are *very* worried about companies selling their information to others without them knowing (42%) or people stealing their identity or personal information (38%).[12]
- 81% say they feel very or somewhat concerned with how companies use the data they collect about them. [13]
- People don't feel in control: Roughly three-quarters or more feel they have very little or no control over the data collected about them by companies (73%)[14]
- 36% strongly agree or somewhat agree they're in control of personal data. A third (29%) were concerned about how retailers and e-commerce companies use consumer data.[15]
- An overwhelming majority (85%) of consumers are taking at least one step to address their privacy and security concerns. However, 75% feel they should be doing more, and many indicate they feel a sense of powerlessness: They believe that companies can track them no matter what they do (26%), don't know what actions they can take (25%), and think hackers can access their data no matter what they do (21%).[16]

29.    This concern over data privacy also impacts consumer purchase behavior:

[8] Gary Drenik, *Data Privacy Tops Concerns For Americans – Who Is Responsible For Better Data Protections?*, FORBES, (Dec. 8, 2023) https://www.forbes.com/sites/garydrenik/2023/12/08/data-privacy-tops-concerns-for-americans--who-is-responsible-for-better-data-protections/.

[9] *Id.*

[10] Colleen McClain, Michelle Faverio, Monica Anderson, & Eugenie Park, *How Americans View Data Privacy*, PEW RESEARCH CENTER, (Oct. 18, 2023) https://www.pewresearch.org/internet/2023/10/18/how-americans-view-data-privacy/.

[11] *Id.*

[12] Colleen McClain, Michelle Faverio, Monica Anderson, & Eugenie Park, *Views of data privacy risks, personal data and digital privacy laws*, PEW RESEARCH CENTER, (Oct. 18, 2023) https://www.pewresearch.org/internet/2023/10/18/how-americans-view-data-privacy/

[13] *Id.*

[14] *Id.*

[15] *Survey Shows Consumers Concerned About Personal Data, Privacy and Internet Safety for Children,* KINETIC, (Jan. 24, 2025) https://www.windstream.com/blog/consumer-data-privacy-survey-2025.

[16] *New Deloitte Survey: Increasing Consumer Privacy and Security Concerns in the Generative AI Era*, DELOITTE, (Dec. 2, 2024) https://www.deloitte.com/us/en/about/press-room/increasing-consumer-privacy-and-security-concerns-in-the-generative-ai-era.html.

- 79% of Americans are concerned about how companies use their data.[17]
- 75% of Americans believe there should be more regulations to protect their privacy from companies collecting consumer data without their consent or knowledge.[18]
- 60% of users say they would spend more money with a brand they trust to handle their personal data responsibly.[19]
- 52% of American users chose not to use a product or service due to worries about how much personal data would be collected about them.[20]
- 48% of users have stopped buying from a company over privacy concerns.[21]
- 33% of users have terminated relationships with companies over data. They left social media companies, ISPs, retailers, credit card providers, and banks or financial institutions.[22]
- 81% of users say the potential risks they face from companies collecting data outweigh the benefits[23]

30.    Consumer concerns over their privacy have been addressed at both the state and federal levels by the California Legislature and the Federal Trade Commission.

//

//

//

---

[17] Brooke Auxier, Lee Rainie, Monica Anderson, Andrew Perrin, Madhu Kumar, & Erica Turner, *Americans and Privacy: Concerned, Confused and Feeling Lack of Control Over Their Personal Information*, PEW RESEARCH CENTER, (Nov. 15, 2019) https://www.pewresearch.org/internet/2019/11/15/americans-and-privacy-concerned-confused-and-feeling-lack-of-control-over-their-personal-information/.

[18] Branka Vuleta, *18 Chilling Privacy Statistics in 2023*, LEGALJOBS (Jul. 22, 2025) https://legaljobs.io/blog/privacy-statistics.

[19] *Global Consumer State of Mind Report 2021,* TRUATA, https://www.truata.com/resources/report/global-consumer-state-of-mind-report-2021/.

[20] Andrew Perrin, *Half of Americans have decided not to use a product or service because of privacy concerns*, PEW RESEARCH CENTER, (Apr. 14, 2020) https://www.pewresearch.org/short-reads/2020/04/14/half-of-americans-have-decided-not-to-use-a-product-or-service-because-of-privacy-concerns/.

[21] Ratnesh Pandey, *Staying Cyber-Secure While Working From Home*, TABLEAU, (updated Jul. 18, 2024) https://public.tableau.com/app/profile/ratnesh2928/viz/Stayingcyber-securewhileworkingfromhome/Stayingcyber-securewhileworkingfromhome/.

[22] *Consumer Privacy Survey*, CISCO, https://www.cisco.com/c/dam/en_us/about/doing_business/trust-center/docs/cisco-cybersecurity-series-2021-cps.pdf.

[23] Brooke Auxier, Lee Rainie, Monica Anderson, Andrew Perrin, Madhu Kumar, & Erica Turner, *Americans and Privacy: Concerned, Confused and Feeling Lack of Control Over Their Personal Information*, PEW RESEARCH CENTER, (Nov. 15, 2019) https://www.pewresearch.org/internet/2019/11/15/americans-and-privacy-concerned-confused-and-feeling-lack-of-control-over-their-personal-information/.

---

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED                                        9

### C.    The Federal Trade Commission and California Legislature's Protection of Consumer Data

31.    The Federal Trade Commission has taken action "against dozens of companies that claimed to safeguard the privacy or security of users' information but didn't live up to their promises in the day-to-day operation of their business."[24]

32.    Notably, the Federal Trade Commission seeks enforcement against companies who violate their representations about safeguarding consumer information:

> When companies tell consumers they will safeguard their personal information, the FTC can and does take law enforcement action to make sure that companies live up these promises. The FTC has brought legal actions against organizations that have violated consumers' privacy rights, or misled them by failing to maintain security for sensitive consumer information, or caused substantial consumer injury. In many of these cases, the FTC has charged the defendants with violating Section 5 of the FTC Act, which bars unfair and deceptive acts and practices in or affecting commerce. In addition to the FTC Act, the agency also enforces other federal laws relating to consumers' privacy and security.[25]

33.    At the state level, the California Legislature is at the forefront of protecting citizens' privacy.  Take, for example, the California Online Privacy Protection Act, requiring companies to "conspicuously post [their] privacy policy" and "[d]isclose whether other parties may collect personally identifiable about an individual consumer's online activities over time and across different Web sites when a consumer uses the operator's Web site or service."[26]  This statute also defines "personally identifiable information ("PII")" as "[a] first and last name," "[a] home or other physical address," "[a]n e-mail address," "[a] telephone number," and "[a]ny other identifier that permits the physical or online contacting of a specific individual."[27]

//

//

---

[24] *Marketing Your Mobile App: Get It Right from the Start,* FEDERAL TRADE COMMISSION, https://www.ftc.gov/business-guidance/resources/marketing-your-mobile-app-get-it-right-start.

[25] *Privacy and Security* Enforcement, FEDERAL TRADE COMMISSION, https://www.ftc.gov/news-events/topics/protecting-consumer-privacy-security/privacy-security-enforcement.

[26] Cal. Bus. & Prof. Code § 22575(a).

[27] Cal. Bus. & Prof. Code § 22575(a).

**D.    Overview of the California Invasion of Privacy Act and the Federal Wiretap Act**

34.    The California Legislature enacted CIPA to protect certain privacy rights of California citizens.  The California Legislature expressly recognized that "the development of new devices and techniques for the purpose of eavesdropping upon private communications . . . has created a serious threat to the free exercise of personal liberties and cannot be tolerated in a free and civilized society."  Cal. Penal Code § 630.

35.    The California Supreme Court has repeatedly stated the "express objective" of CIPA is to "protect a person placing or receiving a call from a situation where the person on the other end of the line *permits an outsider to tap his telephone or listen in on the call*."  *Ribas v. Clark*, 38 Cal. 3d 355, 364 (1985) (emphasis added).

36.    Further, as the California Supreme Court has held in explaining the legislative purpose behind CIPA:

> While one who imparts private information risks the betrayal of his confidence by the other party, a substantial distinction has been recognized between the secondhand repetition of the contents of a conversation and its *simultaneous dissemination to an unannounced second auditor, whether that auditor be a person or mechanical device.*
>
> As one commentator has noted, such secret monitoring denies the speaker an important aspect of privacy of communication—the right to control the nature and extent of the firsthand dissemination of his statements.

*Ribas*, 38 Cal. 3d at 360-61 (emphasis added; internal citations omitted); *see also Smith v. LoanMe, Inc.*, 11 Cal. 5th 183, 200 (2021) (reaffirming *Ribas*).

37.    As part of CIPA, the California Legislature introduced § 631(a), which imposes liability for "distinct and mutually independent patterns of conduct."  *Tavernetti v. Superior Ct.*, 22 Cal. 3d 187, 192 (1978).  Specifically, CIPA § 631(a) prohibits any person or entity from:

> (i)    "intentionally tap[ping], or mak[ing] any unauthorized connection . . . with any telegraph or telephone wire";
>
> (ii)   "willfully and without the consent of all parties to the communication . . . read[ing], or attempt[ing] to read, or to learn the contents or meaning of any . . . communication while the same is in transit or passing

over any wire, line, or cable, or is being sent from, or received at any place within [California]"; or

(iii)    "us[ing], or attempt[ing] to use . . . any information so obtained."

38.    CIPA § 631(a) also penalizes those who "aid[], agree[] with, employ[], or conspire[] with" or "permit[]" "any person" to conduct the aforementioned wiretapping.

39.    CIPA also outlaws "us[ing] an electronic amplifying or recording device to eavesdrop upon or record [a] confidential communication." Cal. Penal Code § 632. The term "confidential communications" means "any communication carried on in circumstances as may reasonably indicate that any party to the communication desires it to be confined to the parties thereto, but excludes . . . circumstances in which the parties to the communication may reasonably expect that the communication may be overheard or recorded." Cal. Penal Code § 632(c).

40.    Also relevant here, CIPA § 638.51(a) proscribes any "person" from "install[ing] or us[ing] a pen register or a trap and trace device without first obtaining a court order."

41.    A "pen register" is a "a device or process that records or decodes dialing, routing, addressing, or signaling information transmitted by an instrument or facility from which a wire or electronic communication is transmitted, but not the contents of a communication."  Cal. Penal Code § 638.50(b).

42.    A "trap and trace device" is a "a device or process that captures the incoming electronic or other impulses that identify the originating number or other dialing, routing, addressing, or signaling information reasonably likely to identify the source of a wire or electronic communication, but not the contents of a communication."  Cal. Penal Code § 638.50(b).

43.    In plain English, a "pen register" is a "device or process" that records *outgoing* information, while a "trap and trace device" is a "device or process" that records *incoming* information.

44.    Historically, law enforcement used "pen registers" to record the numbers of outgoing calls from a particular telephone line, while law enforcement used "trap and trace devices" to record the numbers of incoming calls to that telephone line.  As technology advanced,

however, courts have expanded the application of these surveillance devices to Internet tracking technology.

45.    For example, if a user sends an email, a "pen register" might record the email address it was sent from because this is the user's *outgoing* information.  On the other hand, if that same user receives an email, a "trap and trace device" might record the email address it was sent from because this is *incoming* information that is being sent to that same user.

46.    Although CIPA was enacted before the dawn of the Internet, "the California Supreme Court regularly reads statutes to apply to new technologies where such a reading would not conflict with the statutory scheme."  *In re Google Inc.* 2013 WL 5423918, at *21 (N.D. Cal. Sep. 26, 2013).  Thus, courts have found that internet tracking technology like those here fall under the purview of CIPA § 638.51.  *See, e.g.*, *Shah v. Fandom, Inc*, 754 F. Supp. 3d 924, 930 (N.D. Cal. 2024) (finding trackers similar to those at issue here were "pen registers" and noting "California courts do not read California statutes as limiting themselves to the traditional technologies or models in place at the time the statutes were enacted"); *Mirmalek v. Los Angeles Times Communications LLC*, 2024 WL 5102709, at *3–4  (N.D. Cal. Dec. 12, 2024) (same); *Lesh v. Cable News Network, Inc.,* 767 F. Supp. 3d 33, 40–42 (S.D.N.Y. 2025) (same); *Moody v. C2 Educ. Sys. Inc.,* 742 F. Supp. 3d 1072, 1077 (C.D. Cal. 2024) ("Plaintiff's allegations that the TikTok Software is embedded in the Website and collects information from visitors plausibly fall within the scope of §§ 638.50 and 638.51"); *Greenley v. Kochava, Inc.*, 684 F. Supp. 3d 1024, 1050  (S.D. Cal. 2023) (referencing CIPA's "expansive language" when finding software was a "pen register"); *Javier v. Assurance IQ, LLC,* 2022 WL 1744107, at *1  (9th Cir. May 31, 2022) ("Though written in terms of wiretapping, [CIPA] Section 631(a) applies to Internet communications").

47.    This accords with the fact that, "when faced with two possible interpretations of CIPA, the California Supreme Court has construed CIPA in accordance with the interpretation that provides the greatest privacy protection."  *Matera v. Google Inc.* 2016 WL 8200619, at *19 (N.D. Cal. Aug. 12, 2016).

48. Individuals may bring an action against a violator of CIPA § 631, 632, and 638.51 for $5,000 per violation. Cal. Penal Code § 637.3.

49. In a manner similar to CIPA, the Federal Wiretap Act (i.e. the ECPA) creates "a comprehensive scheme for the regulation of wiretapping and electronic surveillance."[28]

50. Although the ECPA does not apply "where one parties to the communication has given consent[,]" the ECPA eliminates the one-party consent exception when the conduct was for the "the purpose of committing any criminal or tortious act in violation of the Constitution or laws of the United States or of any State."[29]

**E.      Function of the Tracking Technologies**

51. Web browsers are software applications that allow consumers to navigate the internet and view and exchange electronic information and communications. Each device (such as a computer, tablet, laptop, or smartphone) accesses web content through a web browser (*e.g.*, Chrome, Safari, Edge, etc.).

52. Every website is hosted by a computer server that holds the website's contents and through which the entity in charge of the website exchanges communications with the consumer's device via web browsers.

53. Web communications consist of HTTP Requests and HTTP Responses and any given browsing session may consist of thousands of individual HTTP Requests and HTTP Responses, along with corresponding cookies:

- HTTP Request: an electronic communication sent from a device's browser to the website's server. GET Requests are one of the most common types of HTTP Requests. In addition to specifying a particular URL (i.e., web address), GET Requests can also send data to the host server embedded inside the URL, and can include cookies.

- Cookies: a small text file that can be used to store information on the device which can later be communicated to a server or servers. Cookies are sent with HTTP Requests from devices to the host server. Some cookies are "third-party cookies," which means they can store and communicate data when visiting one website to an entirely different website.

---

[28] *People v. Roberts*, 184 Cal. App. 4th 1149, 1167 (2010).

[29] 18 U.S.C. § 2511(d)

▪ HTTP Response: an electronic communication that is sent as a reply to the device's web browser from the host server in response to a HTTP Request. HTTP Responses may consist of a web page, another kind of file, text information, or error codes, among other data.

54. A consumers' HTTP Request essentially asks the website to retrieve certain information (such as payment submissions and user selections), and the HTTP Response renders or loads the requested information in the form of "Markup" (the pages, images, words, buttons, and other features that appear on the consumer's screen as they navigate the Website).

55. Every website is comprised of Markup and "Source Code." Source Code is a set of instructions that commands the website visitor's browser to take certain actions when the web page first loads or when a specified event triggers the code.

56. Source Code may also command a web browser to send data transmissions to third parties in the form of HTTP Requests quietly executed in the background without notifying the web browser's user. The Klaviyo tracking codes embedded on the Website by Defendant constitute Source Code.

57. For example, to make Defendant's Websites load on a user's internet browser, the browser sends an "HTTP request" or "GET" request to Defendant's server where the relevant Websites' data is stored. In response to the request, Defendant's server sends an "HTTP response" back to the browser with a set of instructions. A general diagram of this process is pictured at Figure 5, which explains how Defendant's Websites transmit instructions back to users' browsers in response to HTTP requests.



**Figure 5**

### F.    Klaviyo's Tracking Technologies

58.    Klaviyo operates one of the largest marketing platforms in the country.  "Today, 176,000+ brands worldwide use Klaviyo not just to sell but to create lifelong customer relationships."[30]  Given Klaviyo's pervasiveness, the company collects more than "2+ billion daily events" and manages "7+ billion customer profiles."[31]

59.    Hundreds of thousands of businesses, such as the portfolio of brands under the "Authentic Brands Group" and many others, have embedded Klaviyo's tracking software into their e-commerce websites, thereby giving Klaviyo access to billions of transactions.[32]

60.    Klaviyo offers businesses—like Defendant—onsite tracking through its  "Active on Site" tracking code product.[33]

61.    "The code snippet for onsite tracking is known as Klaviyo's onsite JavaScript or 'Klaviyo.js.'"[34]  The "Active on Site" code snippet can be plugged into any website, as it is a piece of JavaScript code that is either installed on a website or integrated with an e-commerce store.[35]

62.    Klaviyo uses the "__kla_id" and "kl-post-identification-sync" cookies to track both identified and anonymous users in conjunction with the "Active on Site" tracking code to compile Klaviyo profiles.[36]

63.    Klaviyo collects three main types of data: "Event data," which includes events such as "Active on Site, Placed Order, or Fulfilled Order;" "Profile data," which includes "attributes

---

[30] KLAVIYO, *About Klaviyo*, https://www.klaviyo.com/about.

[31] *Id.*

[32] *Klaviyo Announces Third Quarter 2024 Financial Results*, KLAVIYO, https://www.klaviyo.com/newsroom/klaviyo-third-quarter-2024-financial-results

[33] KLAVIYO, *Getting started with Klaviyo onsite tracking*, https://help.klaviyo.com/hc/en-us/articles/115005076767.

[34] *Id.*

[35] *Id.*

[36] KLAVIYO*, supra*, note 33; KLAVIYO, *Understanding Klaviyo's anonymous visitor activity backfill*, https://help.klaviyo.com/hc/en-us/articles/17928628922395.

such as First Active, Last Active, Source, First Name, and Last Name;" and "Catalog data," which includes "items found within your product catalog."[37]

64.    Once Klaviyo collects a treasure trove of consumer interest and spending data through its "powerful web tracking" software, it engages in further data matching by using its identity resolution product whereby Klaviyo creates "360º customer profiles that [go] way beyond contact info."[38]

65.    Indeed, Klaviyo profiles show "every action a customer takes, as it happens: what they're eyeing, buying, clicking, and far more."[39] Klaviyo creates a robust consumer profile from various sources and devices used by the consumer.

66.    Klaviyo also developed its own artificial intelligence and machine learning model product called Klaviyo AI, which analyzes consumer spending data to make various predictions about the consumer such as their next purchase, churn risk, and even their gender.[40]



**Figure 4**

[37] KLAVIYO, *Getting started with data capture in Klaviyo*, https://help.klaviyo.com/hc/en-us/articles/20920631501979.

[38] KLAVIYO, *Customer Profiles*, https://www.klaviyo.com/features/customer-profiles.

[39] KLAVIYO, *supra*, note **Error! Bookmark not defined.**.

[40] KLAVIYO, *CRM with AI*, https://www.klaviyo.com/platform/crm-with-ai; *5 ways using predictive analytics in marketing can help you deliver what your customers want*, KLAVIYO, https://www.klaviyo.com/blog/predictive-analytics-for-customer-retention.

67.    Klaviyo touts that its customer profiles show "[e]verything to know about your customers, in one place" and explains that "customer profiles consolidate data across your stack for a complete picture of each customer: who they are, what they like, and when and how they're engaging with you.  All this customer profile data is for building segments and personalizing content."  *See* Fig. 4.

68.    Klaviyo customer profiles contain a consumer's purchase activity (e.g., the order they placed and the products they ordered), their web activity (e.g., the products they viewed, items they added to cart, forms they completed, and site searches they performed), as well as sixteen default "Klaviyo Properties" that cannot be removed.[41]  *See* Figs. 4–6.



**Figure 5**

//

//

//

//

//

---

[41] KLAVIYO, *Profile Properties Reference*, https://help.klaviyo.com/hc/en-us/articles/115005074627.

69.    Klaviyo ensures that collected Consumer Web Activity does not remain anonymous. Klaviyo collects text consumers enter into website forms such as their names, email addresses, phone numbers, and other identifiers, making it easy to track consumers across devices.  For example, Klaviyo collects names, email addresses, and phone numbers when a consumer makes a purchase, signs up for an email newsletter, or provides contact information to redeem a promotional offer.  *See*, Fig. 7.

**Figure 7**

70.    The process of collecting and correlating consumer data into one profile is called identity resolution.  Klaviyo describes the process as such:

> Identity resolution refers to the process of maintaining a unified customer record, regardless of the various identifiers (e.g. email, phone number, etc.) used across different touchpoints or devices.  This results in a singular, comprehensive profile for each individual person, irrespective of the channels they interact through.[42]

71.    Klaviyo also utilizes a feature called "anonymous visitor activity backfill" that allows it to correlate previously anonymous Consumer Web Activity with an identified consumer.[43] Klaviyo explains: "[w]ith Klaviyo's anonymous visitor activity backfill, you can capture onsite activity for a shopper prior to identification.  Once that visitor is identified in the future, you'll have access to their historical onsite events . . . .  To collect onsite data for

---

[42] KLAVIYO, *Understanding Identity Resolution in Klaviyo*, https://help.klaviyo.com/hc/en-us/articles/12902308138011.

[43] KLAVIYO, *Understanding Klaviyo's anonymous visitor activity backfill*, https://help.klaviyo.com/hc/en-us/articles/17928628922395.

anonymous visitors, Klaviyo records data about a visitors [sic] actions as they occur and stores that locally in their browser.  In the future when that visitor is identified, that data is then sent to Klaviyo and cleared from the browser.  Any future onsite activity will be tracked as usual through the Klaviyo cookie once they have been identified as well."[44]

72.     One feature, among many, Klaviyo has created from collected Consumer Web Activity is the ability for its business customers to leverage Klaviyo's data and compare their e-commerce store's performance with that of other stores within the same industry.  For instance, Klaviyo shows businesses their store's average cart size, order count, and order value and how it compares to other businesses in the same industry.  Klaviyo can also show businesses the rate of consumers signing up for their marketing campaigns compared to other businesses in the same industry.  As such, has built a benchmark tool using Consumer Web Activity and has sold access to the tool to businesses using Klaviyo.

73.     Indeed, Klaviyo's SEC investor filings confirm that Klaviyo plans to increase the number of customers using its platform so that it can use the data to refine its products:

> Our platform and customers benefit from significant network effects. As of June 30, 2023, we assembled over 6.9 billion consumer profiles across our customer base, and in the twelve month period ended June 30, 2023, we processed over 695 billion events, which are data on how consumers engage across channels, such as opening an email, browsing a website, or placing an order. **As we add more customers and more anonymized data on our platform, we are able to better refine our predictive models of consumer behavior.**[45]

74.     Defendant knows that Klaviyo uses identifiers and online activity for its own commercial purposes.  Among other things, Klaviyo makes prominent representations on its website about how it leverages personal information to enhance its platform.  Klaviyo claims, for example, that it's AI "is trained on your brand, website, catalog, and profiles . . . ."[46]

---

[44] *Id.*

[45] Klaviyo, Inc., Annual Report (Form 10-K) (Feb. 23, 2024).

[46] KLAVIYO, *Klaviyo AI*, https://www.klaviyo.com/solutions/ai.

75.    At a minimum, Defendant uses the Klaviyo tracking technologies on its Website. As a result, Defendant disclosed and Klaviyo intercepted consumers'—including Plaintiff's—interactions on the Website.  Klaviyo received at least the consumers' purchase information and consumer's email address which it can associate with the consumer's identity.  Klaviyo and Defendant used this data, as well as other data uploaded directly to Klaviyo by Defendant, so that Defendant could run advertisements using its services.

76.    Plaintiff did not consent to the interception or disclosure of his data to Klaviyo. Defendant's disclosure, and Klaviyo's interception, of Plaintiff's and prospective class members' PII without their consent is an invasion of privacy and violates several laws, including the ECPA (18 U.S.C. §2511, *et seq.*); CIPA §§ 631–32, 638.51; and the California Constitution.

**G.    Defendant's Use of the Tracking Technologies**

77.    Pursuant to agreements with third parties—here, Klaviyo—Defendant intentionally and voluntarily embedded the Tracking Technologies on the Website.  As illustrated within this section, Defendant unlawfully disclosed personally identifiable information to Klaviyo through Tracking Technologies, without customer consent.

78.    The Tracking Technologies are Source Code that do just that—they surreptitiously transmit a Website User's communications and inputs to the corresponding user IDs, much like a traditional wiretap.

79.    For example, when individuals visit Defendant's Website via an HTTP request to Defendant's server, Defendant's server sends an HTTP response (including the Markup) that displays the webpage visible to the User, along with Source Code (including the Tracking Technologies).

80.    Thus, Defendant is, in essence, handing its customers a tapped website and, once a webpage is loaded into the user's browser, the software-based wiretaps are quietly waiting for private communications on the webpage to trigger the Tracking Technologies, which then intercept those communications—intended only for Defendant—and instantaneously transmit those communications to Klaviyo, or other third parties.

81.     Third parties—including Klaviyo—offer companies, including Defendant, snippets of code they can install in web browsers of users accessing their services. These code snippets uniquely identify the user and are sent with each intercepted communication to ensure the third party can identify the specific user associated with the information intercepted (in this case, confidential PII, purchase information, IP, browser fingerprints, etc.).

82.     Defendant intentionally configured the Tracking Technologies installed on its Website to capture both the "characteristics" of individual's communications with its Website (their IP addresses, cookie identifiers, device identifiers, emails, and phone numbers) and the "content" of these communications (the buttons, links, pages, and tabs they click, and view related to the shopping and products sought from Defendant).

83.     Defendant installs these Tracking Technologies despite its understanding that its customers reasonably anticipate their identifiable information to be kept confidential and undisclosed to unknown third parties.  This installation contradicts Defendants promise to keep PII confidential. *See supra*–Fig. 1–3.  Contrary to its promise, as soon as consumers enter Defendant's Website, Defendant begins tracking and disclosing their interactions with the Website to the third parties—including Klaviyo.

84.     When users access the Website, Defendant discloses the URLs and page titles of every page that they visit, including during the checkout process.  The URLs and page titles disclose what type of product the user is seeking to purchase.  For example, when a consumer clicks on a product, the URL of the page for that product, which includes information about the product is shared, is shared with Klaviyo and various other third parties as enabled by Defendant. Klaviyo also receive information when the consumer adds the product to their cart before checkout, and when they add their payment info.  *See e.g.* Fig. 8.

//

//

//

//

//

"name": "Viewed Product"
}
}
},
"time": "2026-01-28T16:43:10.810Z",
"properties": {
"Name": "MarlinÂ® Chronograph Tachymeter 40mm Leather Strap Watch",
"ProductID": 7514559414355,
"Categories": ["Best Selling Men's Watches", "Best Selling Watches", "Blue Watches",
"Chronograph Watches for Men", "Eco-Friendly Watches", "Email Promo Inclusions", "Fathers Day Watches", "Flash Sale",
"Gifts for the Graduate", "Gifts Under $300", "GOAT Movie", "Marlin Chronograph Tachymeter Watches",
"MarlinÂ® Watches", "Men's Dress Watches", "Men's Flash Sale", "Men's Leather Watches", "Men's Watches",
"Product Manual: Chronograph with Sub-dials at 6 9 12 and Date", "Top Rated Watches", "Valentines Day Watch Gifts",
"Vintage-Inspired Watches for Men", "Watch Gifts", "Watch Gifts for Men", "Watches and Accessories"],
"ImageURL":
"https://timex.com/cdn/shop/files/TW2W99000_500fad3b-cd11-40bc-9b35-4e1d4fd73a8a_grande.png?v=1757538183",
"URL":
"https://timex.com/products/marlin-chronograph-tachymeter-40mm-leather-strap-watch-tw2w99000",
"Brand": "TIMEX",
"Price": "$209.00",
"Value": "209.00",
"CompareAtPrice": "$209.00",
"anonymous_backfill_source": "checkout_pixel_checkout_contact_info_submitted"

**Figure 8**

85.     When a user adds the product to their cart, Defendant intercepts and discloses even more information about the product being purchased, for example, the total price, SKU, vendor, the presentment price, the URL of the item page, whether it is a variant design, the product type, title and description of the item.  Fig. 9.

"type": "event",
"attributes": {
"metric": {
"data": {
"type": "metric",
"attributes": {
"name": "Added to Cart"
}
}
},
"time": "2026-01-28T16:44:00.192Z",
"properties": {
"total_price": 228.99,
"$value": 228.99,
"total_discount": 0,
"original_total_price": 228.99,
"items": [{
"id": 42430284136531,
"properties": {},
"quantity": 1,
"variant_id": 42430284136531,
"key": "42430284136531:07390365a32460b0c21339d2f5b23848",
"title": "MarlinÂ® Chronograph Tachymeter 40mm Leather Strap Watch",
"price": 20900,
"original_price": 20900,
"presentment_price": 209,
"discounted_price": 20900,
"line_price": 20900,
"original_line_price": 20900,
"total_discount": 0,
"discounts": [],
"sku": "TW2W99000VQ",
"grams": 0,
"vendor": "TIMEX",
"taxable": true,
"product_id": 7514559414355,
"product_has_only_default_variant": true,
"gift_card": false,
"final_price": 20900,
"final_line_price": 20900,
"url": "/products/marlin-chronograph-tachymeter-40mm-leather-strap-watch-tw2w99000?variant=42430284136531",
"featured_image": {
"aspect_ratio": 0.833,
"alt": "TW2W99000 MarlinÂ® Chronograph Tachymeter 40mm Leather Strap Watch Primary Image",
"height": 1200,
"url": "https://cdn.shopify.com/s/files/1/0573/1198/5747/files/TW2W99000_500fad3b-cd11-40bc-9b35-4e1d4fd73a8a.png?v=1757538183",
"width": 1000
},
"image": "https://cdn.shopify.com/s/files/1/0573/1198/5747/files/TW2W99000_500fad3b-cd11-40bc-9b35-4e1d4fd73a8a.png?v=1757538183",
"handle": "marlin-chronograph-tachymeter-40mm-leather-strap-watch-tw2w99000",
"requires_shipping": true,
"product_type": "Watch",
"product_title": "MarlinÂ® Chronograph Tachymeter 40mm Leather Strap Watch",
"product_description":
"A bold racing stripe ignites the rich blue dial of this beautifully detailed update to our Marlin Quartz Chronograph Tachymeter. At the 3 oâ€™clock mark, youâ€™ll find a 24-hour dial decorated with the checkered flags that signal victory on the racetrack. Driven by an ultra-precise quartz movement, this smooth timepiece includes a chronograph for tracking time and a tachymeter index along its outer minute track for measuring speed. Though it brings a new and exciting edge to our Marlin collection, it retains classic Marlin features a sturdy 40mm stainless steel case, domed acrylic crystal, and retro-style applied indices at 3, 9, and 12 o'clock. Completing its racing aesthetic is a perforated blue natural strap sourced from the Leather Working Group (LWG) and equipped with quick-release spring bars.Â ",

**Figure 9**

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED                                        23

86.    When a user completes the checkout process, Defendant intercepts and discloses the user's email to Klaviyo through Klaviyo's Tracking Technologies.  Fig. 10.  Klaviyo associates the purchaser's email, with various data points from their device, for instance their browser and operating system.  Fig. 11

```
"profile": {
    "data": {
        "type": "profile",
        "attributes": {
            "email": "████████████"
        },
        "meta": {
            "identifiers": {
                "email": "███████████"
            }
        }
    }
},
```

**Figure 10**

```
"time": "2026-01-28T16:40:59.558Z",
"properties": {
    "initial_page_path": "/",
    "page": "https://timex.com/",
    "browser": "Chrome",
    "os": "Windows",
    "anonymous_backfill_source": "checkout_pixel_checkout_contact_info_submitted"
}
```

**Figure 11**

87.    Defendant intercepts and discloses to Klaviyo all of this information—including, but not limited to, plain-text email (i.e., PII), browser details, operating system, and purchase details—all of which it incorporates into a consumer profile, even when the purchaser rejects all cookies.

**H.    The Tracking Technologies Also Operate As Pen Registers**

88.    When companies build their websites, they install or integrate various third-party scripts into the code of the website to collect data from users or perform other functions.[47]

---

[47] See *Third-party Tracking*, PIWIK, https://piwik.pro/glossary/third-party-tracking/ ("Third-party tracking refers to the practice by which a tracker, other than the website directly visited by the user, traces or assists in tracking the user's visit to the site. Third-party trackers are snippets of code that are present on multiple websites. They collect and send information about a user's browsing history to other companies…").

89. Often, third-party scripts are installed on websites "for advertising purposes."[48] Further, "[i]f the same third-party tracker is present on many sites, it can build a more complete profile of the user over time."[49]

90. Defendant incorporates the Klaviyo Tracking Technology code into the code of its Website, including when Plaintiff and Class Members visited the Website. Thus, when Plaintiff and Class Members visited the Website, Defendant caused the Tracker to be installed on Plaintiff's and Class Members' browsers. This allowed the Klaviyo—through their respective Technologies—to collect Plaintiff's and Class Members' IP addresses and Device Metadata and pervasively track them across the Internet.

91. The Tracking Technologies also cause additional data points to be sent from Plaintiff's and Class Members' browser to third parties such as Klaviyo, which are meant to uniquely identify users across sessions and devices. In addition to the public IP address, key elements include the user-agent string (browser, operating system, and device type) and device capabilities such as supported image formats and compression methods. Persistent identifiers including the email address, ensure users can be tracked even after clearing standard session data like cookies. Advanced methods like fingerprinting and server-side matching remain unaffected by cookie deletion. Combined, these elements form a detailed, unique fingerprint that allows for cross-site tracking and behavioral profiling.

92. Defendant and Klaviyo then use the public IP addresses, Device Metadata, and unique identifiers of the Website's visitors that are collected and sent by the Tracking Technologies, including those of Plaintiff and Class Members, to de-anonymize Plaintiff and Class Members, serve hyper-targeted advertisements on Plaintiff and Class Members, and unjustly enrich themselves through this improperly collected information.

93. At no time prior to the installation and use of the Tracking Technologies on Plaintiff's and Class Members' browsers, or prior to the use of the Tracker, did Defendant procure

---

[48] *Id.*
[49] *Id.*

Plaintiff's and Class Members' consent for such conduct. Nor did Defendant obtain a court order to install or use the Tracking Technologies.

94. Because, as described herein, the Tracking Technologies also collect users' addressing, routing, or signaling information—IP addresses, Device Metadata, and/or the unique user IDs—the Tracking Technologies also operate as pen registers.

**I.  Tolling**

95. Any applicable statutes of limitations have been tolled by Defendant's knowing and active concealment of its incorporation of the Tracking Technologies onto the Website.

96. The Tracking Technologies are entirely invisible to a website visitor.

97. Through no fault or lack of diligence, Plaintiff and members of the putative classes were deceived and could not reasonably discover Defendant's deceptive and unlawful conduct.

98. Plaintiff was ignorant of the information essential to pursue his claims, without any fault or lack of diligence on his part.

99. Defendant had exclusive knowledge that the Website incorporated the Tracking Technologies yet failed to disclose to its users, including Plaintiff, that by using Defendant's e-commerce platform through the Website, their personally identifiable information and purchase information would be disclosed to third parties, including Klaviyo.

100. Under the circumstances, Defendant was under a duty to disclose the nature, significance, and consequences of its collection and treatment of its customers information. In fact, to the present, Defendant has not conceded, acknowledged, or otherwise indicated to its users that it has disclosed or released their personally identifiable and purchase information to unauthorized third parties. Accordingly, Defendant is estopped from relying on any statute of limitations.

101. Moreover, all applicable statutes of limitations have also been tolled pursuant to the discovery rule.

102. The earliest that Plaintiff, acting with due diligence, could have reasonably discovered Defendant's conduct would have been shortly before the filing of the initial complaint in this matter due to the investigation of undersigned counsel.

## CLASS ALLEGATIONS

103.    **Class Definition:** Plaintiff brings this action individually and on behalf of various classes of persons similarly situated, as defined below, pursuant to Rule 23(b)(2), 23(b)(3), and 23(c)(4) of the Federal Rules of Civil Procedure.

The **Nationwide Class** that Plaintiff seeks to represent is defined as:
All individuals residing in the United States who made a purchase on the website, www.timex.com, during the Class Period.

The **California Subclass** that Plaintiff seeks to represent is defined as:
All individuals residing in California who made a purchase on the website, www.timex.com, during the Class Period.

104.    The "Class Period" is the time period beginning on the date established by the Court's determination of any applicable statute of limitations, after consideration of any tolling, concealment, and accrual issues, and ending on the date of entry of judgment.

105.    The Nationwide Class and California Subclass are referred to collectively as the "Classes."

106.    Excluded from the proposed Classes are Defendant; any affiliate, parent, or subsidiary of Defendant, any entity in which Defendant has a controlling interest; any officer, director, or employee of Defendant, any successor or assign of Defendant; anyone employed by counsel in this action; any judge to whom this case is assigned, his or her spouse and immediate family members; and members of the judge's staff.

107.    Plaintiff reserves the right to amend the definitions of the Class or Subclass and add subclasses if further information and discovery indicate that the definitions should be narrowed, expanded, or otherwise modified.

108.    **Numerosity:** Members of the Classes are so numerous that joinder of all members would be unfeasible and not practicable.  The exact number of Class Members is unknown to Plaintiff at this time.  However, it is estimated that there are at least thousands of individuals in the Classes.  The identity of such membership is readily ascertainable from Defendant's records and third party Klaviyo's records.

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED                                27

109. **Existence and Predominance of Common Questions of Fact and Law:** There is a well-defined community of interest in the questions of law and fact involved affecting the members of the proposed Classes. The questions of law and fact common to the proposed Classes predominate over questions affecting only individual class members. Such questions include, but are not limited to, the following:

a. Whether Defendant's acts and practices violated the ECPA.

b. Whether Defendant's acts and practices violated CIPA § 631;

c. Whether Defendant's acts and practices violated CIPA § 632;

d. Whether Defendant's acts and practices violated CIPA § 638.51;

e. Whether Defendant's acts and practices violated the privacy rights of Plaintiff and members of the California Class under the California Constitution; and

f. Whether Plaintiff and members of the proposed Classes are entitled to damages, reasonable attorneys' fees, pre-judgment interest and costs of this suit.

110. **Typicality:** The claims of the named Plaintiff are typical of the claims of the Classes because the Plaintiff, like all other class members, visited the Website and had his confidential electronic communications intercepted and disclosed to Klaviyo.

111. **Adequacy:** Plaintiff is an adequate representative of the Classes because his interests do not conflict with the interests of the Classes he seeks to represent, he has retained competent counsel experienced in prosecuting class actions, and he intends to prosecute this action vigorously. The interests of the Classes will be fairly and adequately protected by Plaintiff and his counsel.

112. **Superiority:** The class mechanism is superior to other available means for the fair and efficient adjudication of the claims of the Classes. Each individual Class Member may lack the resources to undergo the burden and expense of individual prosecution of the complex and extensive litigation necessary to establish Defendant's liability. Individualized litigation increases the delay and expense to all parties and multiplies the burden on the judicial system presented by the complex legal and factual issues of this case. Individualized litigation also presents a potential for inconsistent or contradictory judgments. In contrast, the class action device presents far fewer

management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court on the issue of Defendant's liability.  Class treatment of the liability issues will ensure that all claims and claimants are before this Court for consistent adjudication of the liability issues.  Finally, Defendant has acted or refused to act on grounds generally applicable to the Classes, thereby making it appropriate for this Court to grant final injunctive relief and declaratory relief with respect to the Classes as a whole.

**CAUSES OF ACTION**

**COUNT I**
**Violation Of The Electronic Communication Privacy Act,**
**18 U.S.C. § 2511, *et seq.***
**(On Behalf of the Nationwide Class)**

113.    Plaintiff incorporates by reference the allegations contained in the paragraphs above as if fully set forth herein.

114.    Plaintiff brings this claim on behalf of himself and members of the Nationwide Class.

115.    The Electronic Communications Privacy Act ("ECPA") prohibits the intentional interception of the content of any electronic communication.  18 U.S.C. § 2511.

116.    The ECPA protects both the sending and the receipt of communications.

117.    18 U.S.C. § 2520(a) provides a private right of action to any person whose wire or electronic communications are intercepted, disclosed, or intentionally used in violation of Chapter 119.

118.    The transmission of Plaintiff's sensitive and personal information to Defendant's website qualifies as a "communication" under the ECPA's definition of 18 U.S.C. § 2510(12).

119.    The transmission of PII between Plaintiff and Class Members and Defendant's Website with which they chose to exchange communications are "transfer[s] of signs, signals, writing, . . . data, [and] intelligence of [some] nature transmitted in whole or in part by a wire, radio, electromagnetic, photoelectronic, or photooptical system that affects interstate commerce" and are therefore "electronic communications" within the meaning of 18 U.S.C. § 2510(12).

120. The ECPA defines "contents," when used with respect to electronic communications, to "include[] any information concerning the substance, purport, or meaning of that communication." 18 U.S.C. § 2510(8).

121. The ECPA defines an interception as the "acquisition of the contents of any wire, electronic, or oral communication through the use of any electronic, mechanical, or other device." 18 U.S.C. § 2510(4).

122. The ECPA defines "electronic, mechanical, or other device," as "any device . . . which can be used to intercept a[n] . . . electronic communication[.]" 18 U.S.C. § 2510(5).

123. The following instruments constitute "devices" within the meaning of the ECPA:

    a. The computer codes and programs Defendant and Klaviyo used to track Plaintiff's and Class Members' communications while they were navigating the Website;

    b. Plaintiff's and Class Members' browsers;

    c. Plaintiff's and Class Members' mobile devices;

    d. Defendant's and Klaviyo's web and ad servers;

    e. The plan that Defendant and Klaviyo carried out to effectuate the tracking and interception of Plaintiff's and Class Members' communications while they were using a web browser to navigate the Website;

124. Plaintiff's and Class Members' interactions with Defendant's website are electronic communications under the ECPA.

125. By utilizing and embedding the tracking technologies provided by Klaviyo on the Website, Defendant intentionally intercepted, endeavored to intercept, and/or procured another person to intercept, the electronic communications of Plaintiff and Class Members in violation of 18 U.S.C. § 2511(1)(a).

126. Specifically, Defendant intercepted—in real time—Plaintiff's and Class Members' electronic communications via the tracking technologies provided by Klaviyo on its website, which tracked, stored and unlawfully disclosed Plaintiff's and Class Members' PII and sensitive and personal information to Klaviyo.

127. The Defendant intercepted communications that include, but are not necessarily limited to, communications to/from Plaintiff and Class Members regarding their PII, including their identities and information related to their purchase on the Website.  This confidential information is then monetized for targeted advertising purposes, among other things.

128. By intentionally disclosing or endeavoring to disclose Plaintiff's and Class Members' electronic communications to Klaviyo through the Tracking Technologies, while knowing or having reason to know that the information was obtained through the interception of an electronic communication in violation of 18 U.S.C. § 2511(1)(a), Defendant violated 18 U.S.C. § 2511(1)(c).

129. By intentionally using, or endeavoring to use, the contents of Plaintiff's and Class members' electronic communications, while knowing or having reason to know that the information was obtained through the interception of an electronic communication in violation of 18 U.S.C. § 2511(1)(a), Defendant violated 18 U.S.C. § 2511(1)(d).

130. Defendant intentionally intercepted the contents of Plaintiff's and Class Members' electronic communications for the purpose of committing a criminal or tortious act in violation of the Constitution or laws of the United States or of any state, namely, invasion of privacy.

131. The party exception in 18 U.S.C. § 2511(2)(d) does not permit a party that intercepts or causes interception to escape liability if the communication is intercepted for the purpose of committing any tortious or criminal act in violation of the Constitution or laws of the United States or of any State.

132. As a result of the above actions and pursuant to 18 U.S.C. § 2520, the Court may award statutory damages to Plaintiff and Class Members; injunctive and declaratory relief; punitive damages in an amount to be determined by a jury, but sufficient to prevent the same or similar conduct by Defendant in the future; reasonable attorney's fees; and other litigation costs reasonably earned.

//

//

//

**COUNT II**
**Violation Of The California Invasion Of Privacy Act,**
**Cal. Penal Code § 631**
**(On Behalf of the California Subclass)**

133.    Plaintiff incorporates by reference the preceding paragraphs as if fully set forth herein.

134.    Plaintiff brings this claim against Defendant individually and on behalf of the California Subclass.

135.    The California Invasion of Privacy Act ("CIPA") is codified at Cal. Penal Code §§ 630–638.  CIPA begins with its statement of purpose—namely, that the purpose of CIPA is to "protect the right of privacy of the people of [California]" from the threat posed by "advances in science and technology [that] have led to the development of new devices and techniques for the purpose of eavesdropping upon private communications . . . ." Cal. Penal Code § 630.

136.    A person violates California Penal Code § 631(a), if:

> By means of any machine, instrument, or contrivance, or in any other manner, [s/he] intentionally taps, or makes any unauthorized connection, whether physically, electrically, acoustically, inductively, or otherwise, with any telegraph or telephone wire, line, cable, or instrument, including the wire, line, cable or instrument of any internal telephonic communication system, or [s/he] willfully and without the consent of all parties to the communication, or in any unauthorized manner, reads, or attempts to read, or to learn the contents or meaning of any message, report, or communication while the same is in transit or passing over any wire, line, or cable, or is being sent from, or received at any place within this state; or [s/he] uses, or attempts to use, in any manner, or for any purpose, or to communicate in any way, any information so obtained . . . .

Cal. Penal Code § 631(a).

137.    Further, a person violates § 631(a) if s/he "aids, agrees with, employs, or conspires with any person or persons to unlawfully do, or permit, or cause to be done any of the acts or things mentioned" in the preceding paragraph.  *Id.*

138.    To avoid liability under § 631(a), a defendant must show it had the consent of <u>all</u> parties to a communication.

139.    At all relevant times, Defendant aided, agreed with, and conspired with Klaviyo to track and intercept Plaintiff's and Class Members' internet communications while accessing the Website.  These communications were intercepted without the authorization and consent of Plaintiff and Class Members

140.    Defendant, when aiding and assisting the Klaviyo's wiretapping and eavesdropping, intended to help Klaviyo learn some meaning of the content in the URLs and the content the visitor requested.

141.    The following items constitute "machine[s], instrument[s], or contrivance[s]" under the CIPA, and even if they do not, the Tracking Technologies fall under the broad catch-all category of "any other manner":

    (a)  The computer codes and programs Klaviyo used to track Plaintiff and Class Members' communications while they were navigating www.timex.com;

    (b)  Plaintiff's and Class Members' browsers;

    (c)  Plaintiff's and Class Members' computing and mobile devices;

    (d)  Klaviyo's web and ad servers;

142.    The web and ad-servers from which Klaviyo tracked and intercepted Plaintiff's and Class Members' communications while they were using a web browser to access or navigate www.timex.com;

143.    The computer codes and programs used by Klaviyo to effectuate its tracking and interception of Plaintiff's and Class Members' communications while they were using a browser to visit www.timex.com; and

144.    The plan Klaviyo carried out to effectuate its tracking and interception of Plaintiff's and Class Members' communications while they were using a web browser to visit www.timex.com.

145.    The information that Defendant transmitted using Tracking Technologies constituted sensitive and confidential personally identifiable information.

146.    As demonstrated hereinabove, Defendant violated CIPA by aiding and permitting Klaviyo to receive its customers' sensitive and confidential online communications through www.timex.com without their consent.

147.    As a result of the above violations, Defendant is liable to Plaintiff and other Class Members in the amount of, the greater of, $5,000 per violation or three times the amount of actual damages.  Additionally, Cal. Penal Code § 637.2 specifically states that "[it] is not a necessary prerequisite to an action pursuant to this section that the plaintiff has suffered or be threatened with, actual damages." Under the statute, Defendant is also liable for reasonable attorney's fees, and other litigation costs, injunctive and declaratory relief, and punitive damages in an amount to be determined by a jury, but sufficient to prevent the same or similar conduct by Defendant in the future.

## COUNT III
### Violation Of The California Invasion Of Privacy Act,
### Cal. Penal Code § 632
### (On Behalf of the California Subclass)

148.    Plaintiff incorporates by reference the foregoing paragraphs as if fully set forth herein.

149.    Plaintiff brings this claim against Defendant individually and on behalf of the California Subclass.

150.    Cal. Penal Code § 632 prohibits "intentionally and without the consent of all parties to a confidential communication," the "use[] [of] an electronic amplifying or recording device to eavesdrop upon or record the confidential communication..

151.    Section 632 defines "confidential communication" as "any communication carried on in circumstances as may reasonably indicate that any party to the communication desires it to be confined to the parties thereto[.]"

152.    The data collected on Defendant's Website constitutes "confidential communications," as that term is used in Section 632, because class members had an objectively reasonable expectation of private with respect to their personally identifiable information.

153. Plaintiff and Class Members expected their communications to Defendant to be confined to Defendant in part, because of Defendant's consistent representations that these communications would remain confidential. Plaintiffs and Class Members did not expect third parties, and specifically Klaviyo, to secretly eavesdrop upon or record this information and their communications.

154. The Tracking Technologies from Klaviyo, are all electronic amplifying or recording devices for purposes of § 632.

155. By contemporaneously intercepting and recording Plaintiff's and Class members' confidential communications to Defendant through this technology, Klaviyo eavesdropped and/or recorded confidential communications through an electronic amplifying or recording device in violation of § 632 of CIPA.

156. At no time did Plaintiff or Class members consent to Defendant's or Klaviyo's conduct, nor could they reasonably expect that their communications to Defendant would be overheard or recorded by Klaviyo.

157. Klaviyo utilized Plaintiff's and Class members' personally identifiable information for their own purposes, including advertising and analytics.

158. Defendant is liable for aiding and abetting violations of Section 632 by the third parties (i.e., Klaviyo).

159. Pursuant to Cal. Penal Code § 637.2, Plaintiff and Members of the California Subclass have been injured by the violations of Cal. Penal Code § 632, and each seek damages for the greater of $5,000 or three times the amount of actual damages, as well as injunctive relief.

## COUNT IV
### Violation Of The California Invasion Of Privacy Act,
### Cal. Penal Code § 638.51(a)

160. Plaintiff incorporates the foregoing allegations as if fully set forth herein.

161. Plaintiff repeats the allegations contained in the foregoing paragraphs as if fully set forth herein.

162.    Plaintiff brings this claim individually and on behalf of the members of the proposed Class against Defendant.

163.    CIPA § 638.51(a) proscribes any "person" from "install[ing] or us[ing] a pen register or a trap and trace device without first obtaining a court order."

164.    A "pen register" is a "a device or process that records or decodes dialing, routing, addressing, or signaling information transmitted by an instrument or facility from which a wire or electronic communication is transmitted, but not the contents of a communication."  Cal. Penal Code § 638.50(b).

165.    The Tracking Technologies are  "pen registers" because they are a "device or process" that recorded or decoded the "routing, addressing, or signaling information"—the IP address, Device Metadata, and unique user IDs—from the electronic communications transmitted by Plaintiff's and Class Members' computers or smartphones.  Cal. Penal Code § 638.50(b); *see also Lesh*, 767 F. Supp. 3d at 40–42.

166.    Likewise, the Tracking Technologies are "pen registers" because they are a "device or process" that is being used to ascertain the identity of visitors to Defendant's Website and are thus capturing "addressing" information.  *Greenley*, 684 F. Supp. 3d at 1050 ("software that identifies consumers" is a pen register).

167.    At all relevant times, Defendant installed the Tracking Technologies—which are pen registers—on Plaintiff's and Class Members' browsers, which allowed Klaviyo to record or decode Plaintiff's and Class Members' IP addresses and Device Metadata.  The Tracking Technologies also set unique user identifiers on Plaintiff's and Class Members' browsers so Klaviyo could deanonymize Plaintiff and Class Members and track them across multiple Website sessions and multiple websites.

168.    Defendant and Klaviyo used the information collected by the Tracking Technologies to:

(a)  identity Plaintiff and Class Members and either create new profiles of them in Klaviyo's respective databases and/or to match Plaintiff and Class Members to

pre-existing profiles (either in Klaviyo's own databases or with another entity's profile);

(b) sell Plaintiff's and Class Members' information to advertisers for hyper-targeted advertising based on the information collected by the Tracking Technologies on the Website and the information contained on any profiles of Plaintiff and Class Members (which are linked to Plaintiff and Class Members via the information collected by Klaviyo on the Website);

(c) actually target Plaintiff and Class Members with advertisements and serve advertisements on Plaintiff and Class Members based on the information collected by Klaviyo on the Website and the information contained on any profiles of Plaintiff and Class Members (which are linked to Plaintiff and Class Members via the information intercepted, collected, and disclosed by Klaviyo on the Website); and

(d) deanonymize Plaintiff and Class Members and generate revenue from the sale of Plaintiff's and Class Members' information—both what is collected on the Website by Klaviyo and the profiles this information is linked to—to advertisers, thus boosting Defendant's, advertisers', and Klaviyo's revenue and the value of Klaviyo's services.

169.    The Tracking Technologies collect both contents and recording information relating to Plaintiff's and Class Members' electronic communications with the Website.  *In re Zynga Privacy Litig.*, 750 F.3d 1098, 1108 (9th Cir. 2014) ("IP addresses constitute addressing information and do not necessarily reveal any more about the underlying contents of communication…") (cleaned up); *Deivaprakash*, 2025 WL 2541952, at *3; *Fregosa*, 2025 WL 2886399, at *5.

170.    Plaintiff and Class Members did not provide their prior consent for Defendant's installation or use of the Tracking Technologies.  Nor did Defendant obtain a court order to install or use the Tracking Technologies.

171.    Pursuant to Cal. Penal Code § 637.2(a), Plaintiff and Class Members have been injured by Defendant's violations of CIPA § 638.51(a), and each seeks statutory damages of $5,000 for each of Defendant's violations of CIPA § 638.51(a).

## COUNT V
### Invasion of Privacy Under California's Constitution
### (On Behalf of the California Subclass)

172.    Plaintiff incorporates the foregoing allegations as if fully set forth herein.

173.    Plaintiff brings this claim against Defendant individually and on behalf of the California Subclass.

174.    Plaintiff and Class Members have an interest in: (1) precluding the dissemination of their sensitive, confidential online communications; and (2) making personal decisions and/or conducting personal activities without observation, intrusion, or interference, including, but not limited to, the right to visit and interact with various internet sites without being subjected to wiretaps without Plaintiff's and Class Members' knowledge or consent.

175.    At all relevant times, by using the Tracking Technologies to record and communicate their sensitive and confidential online communications, Defendant intentionally invaded Plaintiff's and Class Members' privacy rights under the California Constitution.

176.    Plaintiff and Class Members had a reasonable expectation that their sensitive and confidential online communications, identities, and other data would remain confidential and that Defendant would not install wiretaps on www.timex.com .

177.    Plaintiff and Class Members did not authorize Defendant to record and transmit Plaintiff's and Class Members' sensitive confidential online communications.

178.    The invasion of privacy was serious in nature, scope, and impact because it related to their sensitive and private online communications.  Moreover, it constituted an egregious breach of societal norms underlying the privacy right because Defendant promised to keep Plaintiff and Members of the California Subclass's communications confidential.

179.    Accordingly, Plaintiff and members of the California Subclass seek all relief available for invasion of privacy claims under California's Constitution.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff, individually and on behalf of all others similarly situated, seeks judgment against Defendant, as follows:

(a)    For an order certifying the putative Nationwide Class and California Subclass defined above, naming Plaintiff as the representative of the putative Classes, and naming Plaintiff's attorneys as Class Counsel to represent the putative Class and Subclass Members;

(b)    For an order declaring that the Defendant's conduct violates the statutes referenced herein;

(c)    For an order finding in favor of Plaintiff and the putative Classes on all counts asserted herein;

(d)    For statutory damages in amounts to be determined by the Court and/or jury;

(e)    For prejudgment interest on all amounts awarded;

(f)    For injunctive relief as pleaded or as the Court may deem proper; and

(g)    For an order awarding Plaintiff and the putative Classes their reasonable attorneys' fees and expenses and costs of suit.

**JURY TRIAL DEMANDED**

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiff hereby demands a trial by jury for any and all issues in this action so triable of right.

Dated:  January 30, 2026

Respectfully submitted,

**BURSOR & FISHER, P.A**.

By: */s/ Philip L. Fraietta*
    Philip L. Fraietta

Philip L. Fraietta (State Bar No. 354768)
50 Main Street, Suite 475
White Plains, NY 10606
Tel: (914) 874-0710
Fax: (914) 206-3656
E-Mail: pfraietta@bursor.com

*Counsel for Plaintiff*